UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

WADE LEE KATZENBACH,                )
                                    )    2:  14-cv-00161-PK
            Petitioner,             )
                                    )
      v.                            )
                                    )    FINDINGS AND RECOMMENDATION
MARK NOOTH,                         )
                                    )
            Respondent.             )


      Michelle Sweet
      Assistant Federal Public Defender
      101 SW Main Street, Suite 1700
      Portland, Oregon  97204

            Attorney for Petitioner

      Frederick M. Boss
      Deputy Attorney General
      Nick M. Kallstrom
      Senior Assistant Attorney General
      Department of Justice
      1162 Court Street NE
      Salem, Oregon 97301

            Attorneys for Respondent



      1 - FINDINGS AND RECOMMENDATION

PAPAK, Magistrate Judge.

Petitioner Wade Lee Katzenbach brings this habeas corpus action pursuant to 28 U.S.C. § 2254 and challenges his convictions and sentence for kidnapping, rape, unlawful sexual penetration and assault.  For the reasons set forth below, the Petition for Writ of Habeas Corpus [2] should be denied, and Judgment should be entered dismissing this action with prejudice.

## PROCEDURAL BACKGROUND

On July 31, 2003, the Jackson County Grand Jury returned an indictment charging Katzenbach with one count of Kidnapping in the First Degree, one count of Rape in the First Degree, one count of Unlawful Sexual Penetration in the First Degree, one count of Assault in the Second Degree, one count of Menacing, one count of Pointing a Firearm at Another and one count of Contempt of Court. Respondent's Exhibit 103.  The State dismissed the menacing count and the trial court found Katzenbach guilty of contempt.  A jury found him guilty on the remaining counts.  Through a combination of concurrent and consecutive sentences, the sentencing court imposed a sentence totaling 240 months. Respondent's Exhibit 101.

Katzenbach directly appealed his convictions and sentence, but the Oregon Court of Appeals affirmed the trial court without a written opinion, and the Oregon Supreme Court denied review.  *State v. Katzenbach,* 219 Or. App. 664, 184 P.3d 1159 (2008), *rev. denied* 345 Or. 158, 190 P.3d 379 (2008); Respondent's Exhibits 106-111.

Katzenbach next filed for post-conviction relief ("PCR") in state court. The PCR trial court denied relief on his PCR Petition. *Katzenbach v. Nooth*, Malheur County Circuit Court Case No. 09057323P. On appeal, the Oregon Court of Appeals affirmed without a written opinion, and the Oregon Supreme Court denied review. *Katzenbach v. Nooth*, 257 Or. App. 837, 308 P.3d 381 (2013), *rev. denied* 354 Or. 490, 317 P.3d 255 (2013); Respondent's Exhibits 176-181.

On January 29, 2014, Katzenbach filed this action. His claims for relief as set forth in his Petition [2] can be summarized as follows[1]:

Ground One.    Petitioner was denied his right to the effective assistance of trial counsel as guaranteed under the 6th Amendment of the Constitution of the United States as made applicable to the states by the 14th Amendment of the Constitution of the United States. Trial counsel was ineffective in the following ways:

  A.    Trial counsel Robert Abel knowingly submitted an Affidavit that contained false statements to Attorney General (Kroger) for use during post-conviction trial court.

  B.    Trial counsel Robert Abel failed to motion the court to recuse the trial court judge, the Honorable Judge Mejia, because he could not be a fair and impartial judge for Petitioner.

  C.    Trial counsel Robert Abel failed to show that Shannon Katzenbach (accuser) was not a credible witness.

---

[1] Katzenbach sets forth lengthy supporting facts for each of his claims in the Petition.

D.    Trial counsel Robert Abel failed to maintain client confidentiality in aiding the prosecution by exposing a client secret to the DA during a recess, enabling a recall of a witness.

E.    Trial counsel Robert Abel failed to request and observe Petitioner's right to a speedy trial.

Ground Two.   Petitioner was denied the right to effective assistance of Appellate Counsel as guaranteed under the 14th Amendment of the Constitution of the United States.  Appellate counsel was ineffective for failing to raise the following issues for preservation:

A.    Appellate counsel failed to allege that Petitioner was denied the right to a speedy trial.

B.    Appellate counsel failed to show Shannon Katzenbach was not a credible witness.

C.    Appellate counsel failed to show that Honorable Judge Mejia could not be a fair and impartial judge for Petitioner.

D.    Appellate counsel failed to properly argue the Petitioner's claims for violations of his speedy trial rights.

Ground Three.   Petitioner was denied the right to due process of law as guaranteed under the 14th Amendment of the Constitution of the United States in the following ways:

A.    Petitioner was denied the right to a speedy trial.

B.    Petitioner was denied the right to due process of law when the District Attorney withheld exculpatory evidence that would have impeached the state's accusatory witness.

Respondent asks the Court to deny relief on the Petition because:  (1) Katzenbach failed to address all but three subclaims in his brief in support and he failed to meet his burden of demonstrating why he is entitled to relief on the remaining,

4 - FINDINGS AND RECOMMENDATION

unbriefed claims; and (2) his briefed ineffective assistance of trial counsel subclaims were denied in a state court decision entitled to deference.

## DISCUSSION

### I.   Unargued Claims

With the exception of Ground One, Subclaims B-D, Katzenbach does not provide argument to support the merits of his remaining claims. Instead he "submits the remaining claims for this Court's consideration on the existing record." Brief in Support [25], p. 25.

On federal habeas review, Katzenbach must show that the state court determination denying his claims was contrary to or involved an unreasonable application of federal law as established by Supreme Court precedent. 28 U.S.C. § 2254(d). The Court has reviewed Katzenbach's unargued claims on the existing record and determined that they do not entitle him to relief. Further, by not advancing these claims in his supporting memorandum, Katzenbach has failed to meet the burden of proof for habeas relief under § 2254(d) and relief on these claims must be denied.

### II.   Merits

#### A.   Standards

An application for writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct and Katzenbach bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id.* at 410. The state court's application of clearly established law must be objectively unreasonable. *Id.* at 409.

6 - FINDINGS AND RECOMMENDATION

The Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel.   First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-687 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance."  *Id*. at 689.

Second, the petitioner must show that his lawyer's performance prejudiced the defense.   The appropriate test for prejudice is whether the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.  *Id*. at 696.

Under the Anti-Terrorism and Effective Death Penalty Act of 1996's ("AEDPA") deferential standard of review, the key question in analyzing an ineffective assistance of counsel claim brought by a state prisoner is whether the state court's application of *Strickland* was unreasonable.  *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).   "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard ... A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland*

standard itself." *Id.* AEDPA requires a "doubly deferential" review of a state prisoner's ineffective assistance of counsel claim. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1410-11 (2011)(citation omitted). The federal habeas court must show deference both to the state court which previously reviewed the claim, and also to trial counsel him or herself.

B.    **Analysis**

1.    **Katzenbach was denied his right to effective assistance of counsel when counsel failed to seek recusal of the trial judge who, as an attorney, had represented Katzenbach in another criminal matter that had resulted in a significant lawyer-client disagreement (Ground One, Subclaim B)**

According to Katzenbach, due to his counsel, Robert Abel's, failure to move for the trial judge, Judge Mejia's, recusal, Katzenbach's rights under the due process clause to a fair trial before a judge with no presumed or actual bias or interest in the outcome of the trial were violated. Specifically, Katzenbach asserts that Judge Mejia represented him on a criminal matter some ten-plus years prior to the subject case and that Katzenbach believed his then attorney Mejia had tricked him into signing a plea agreement in that case. Katzenbach contends he became angry at Mejia and physically threatened him and that they had another significant conflict a couple of years later involving a car chase.[2] As noted, Katzenbach contends he made Abel aware of these

_____

[2] According to Katzenbach, he made Abel aware that when, then attorney, Mejia refused to honor their agreement, Katzenbach

issues.  Moreover, Katzenbach notes that his concerns about Judge
Mejia are documented in an investigator's and a psychologist's
reports.  Finally, Katzenbach points to numerous comments made by
Judge Mejia during his state court proceedings that he asserts
demonstrate the judge's actual bias.

In response, respondent maintains that Katzenbach never
mentioned his desire to have Judge Mejia removed in any of his *pro
se* pretrial motions or during his *pro se* pretrial arguments to the
court.  Significantly too, while Abel admitted that Katzenbach told
him that the judge had represented him in an earlier criminal
matter, Abel specifically averred:  (1) that Katzenbach made it
clear to him that he did not want to recuse Judge Mejia; (2)
Katzenbach thought it would be nice that the current judge had
previously represented him; (3) Katzenbach never shared the
physical threat/car chase altercations with him; (4) Abel saw no
indication that the judge remembered his earlier representation of
Katzenbach; and (5) Abel's experience told him that Judge Mejia
would be just and fair.  Finally, respondent argues there is no
bias evinced in Judge Mejia's comments.

---

physically threatened Mejia prompting him to start to call the
police and Katzenbach left.  Katzenbach further asserts that he
advised Abel that "[t]here was also a freeway incident on I-5 a
couple of years later involving this conflict.  At the time
[Katzenbach] expected to be questioned or even arrested, and could
not believe that Mr. Mejia never said a word to the authorities."
Respondent's Exhibit 117, Amended PCR Petition, p. 11.

In denying Katzenbach's claim, the PCR trial court made the following pertinent findings and conclusions:

> Court finds attorne[y]s memories more reliable than pet's.  No evidence court biased against pet.  Court believes att. would have filed affid. on judge if told to do so by petit.  Investigation adequate.  Insufficient proof of any inadequacy of any attorney[s].  No prejudice.

Respondent's Exhibit 175, p. 2.

Due process guarantees a defendant a trial by a fair and impartial judge. *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). A violation of this right is a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id*. at 310.  In the Ninth Circuit, it is an open question whether prejudice is presumed under *Strickland* when counsel's errors resulted in structural error.  *See Carrera v. Ayers*, 670 F.3d 938, 942 n.6 (9th Cir. 2011).

In assessing an underlying claim of judicial bias, the Court considers whether petitioner has "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). "In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.'" *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008)(quoting *Liteky v. United States*, 510 U.S. 540,

555 (1994)).  Judicial bias reaching the level of a due process violation, and therefore requiring recusal, is presumed in cases "in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Withrow*, 421 U.S. at 47.  Due process also requires recusal if the judge acts as part of the accusatory process.  *Crater v. Galaza*, 491 F.3d 1119, 1132 (9th Cir. 2007).

Here, Katzenbach points to several comments made by Judge Mejia as evidence of actual bias.  The Court has carefully reviewed the transcript containing the noted comments.  Respondent's Exhibit 104, p. 491 & Exhibit 105, pp. 11, 35, 141, 163-64 & 187-88. First, at a September 12, 2003 hearing concerning counsel's request for a continuance, Judge Mejia explained to Katzenbach that his counsel wanted additional time to do a good job because "if" Katzenbach were to lose on any of the first four charged counts the time he spent in jail awaiting trial would be short in comparison with his eventual sentence.  I find no bias in this comment.  The judge merely advised Katzenbach of the seriousness of the charges against him and reminded him that he was facing potential mandatory sentences.

Second, at the December 9, 2003 hearing concerning uncertainty surrounding Katzenbach's counsel's continued representation of him, Judge Mejia tried to pin Katzenbach down as to whether he wanted his attorney to continue to represent him and remarked that he

suspected Katzenbach had said a lot of things at the jail that he was not repeating in court.  I find no bias in this comment.  The judge's comments were merely his assessment of the fairly significant discrepancy between counsel and Katzenbach's disclosures as to how they were getting along.[3]

Third, at the May 7, 2004 hearing concerning a request for continuance based on counsel, Robert Abel's, request to have Katzenbach further evaluated regarding his ability to aid and assist in his defense, Mejia allowed the continuance, but expressed concern for the victim:  "I am very distressed for the victim.  If this is in fact true, it is horrible.  I have empathy for her."  He also stated that he was going to stay on top of the case and see that it was assigned to him.  Taken in context, I find no bias in these comments.  In objecting to the continuance, the prosecutor cited the impact of delay on the victim.  In light of this concern, Judge Mejia's comments are fairly viewed as an acknowledgment that the continued delay was hard on the victim and a promise not to allow the case to fall through the cracks, but rather to see that there was no unnecessary delay in its resolution.

Fourth, at the September 7, 2004 hearing, Katzenbach's *pro se* arguments notwithstanding, the court, found no 60-day speedy trial violation.  In response to this ruling Katzenbach called Judge

---

[3]  At the time, Don Scales represented Katzenbach.  The Court later granted Katzenbach's Motion to Terminate Scales and to appoint replacement counsel.

12 - FINDINGS AND RECOMMENDATION

Mejia a "[f]ucking crooked son of a bitch[,]" and walked out of the courtroom.[4] Following this incident, the Judge told Abel to tell Katzenbach his lack of cooperation would further delay the matter, thanked both counsel and told them he knew the case was tough on them. Katzenbach now points to these comments as evidence that Judge Mejia harbored constitutionally unacceptable bias against him at trial. I find no bias in these comments. Judge Mejia's comments merely acknowledged Katzenbach's self-defeating behavior and the fact that he was difficult to work for and with--facts fairly supported by the record.

Fifth, at the January 14, 2005 hearing wherein Katzenbach continued to make speedy trial right violation arguments, Judge Mejia advised Katzenbach that if he was convicted on any of the first four counts, the speedy trial rights issue would become moot because "[he's] going to owe the state so much time that it's just ridiculous". Again, I find no bias in this comment. As he did previously, Judge Mejia qualified his comments with "if" he was convicted and tried to focus Katzenbach on helping his counsel defend him on very serious charges rather than continue to fixate on his speedy trial right arguments which the court had already rejected.

---

[4] In a similar outburst, I note that at a February 18, 2004 hearing before Judge Purdy, Katzenbach responded to Purdy's order directing that he be sent to the Oregon State Hospital for further evaluation by telling him "you just screwed up my life" and "fuck you."

Finally, at the March 14, 2005 sentencing hearing the court sentenced Katzenbach to a total of twenty years and commented:

> It was my intention to sentence you to 20 months -- 20
> years total. And, sir, I -- I do believe that there is
> a mental component to what you did that - that you
> obviously were not of your right mind. But, I also
> believe that there was a lot of premeditation going into
> these crimes. And I'm certain it didn't work out the way
> you had planned. But the deception you used, I think,
> calls for the sentence imposed by the Court.

Respondent's Exhibit 104, p. 491. Katzenbach suggests that these comments evince some predetermined, pretrial sentence Judge Mejia had in mind. These arguments notwithstanding, I find no bias in the Judge's comments. The record reveals Judge Mejia carefully considered the charges and potential sentence and arrived at the sentence he found just. There is no support in the record for the proposition that some residual bias left over from Judge Mejia's prior representation of Katzenbach played any role in the sentence he imposed.

Accordingly, Katzenbach fails to support his contention that the Judge's comments examined above, either taken individually or as a whole, show he was actually biased against Katzenbach.

I turn next to Judge Mejia's former representation of Katzenbach and Katzenbach's assertion that he informed Abel that he had threatened his then attorney and had later had a car chase altercation with him. As noted above, Abel denies having this information at trial. Katzenbach's assertions, as well as his contentions that he repeatedly instructed Abel to "deal with" the

14 - FINDINGS AND RECOMMENDATION

Judge Mejia bias issue, boil down to a question of credibility between Katzenbach and Abel--a question that the PCR court squarely addressed and concluded favored counsel.

Katzenbach now contends the PCR court's credibility determination is not entitled to deference because it is based on an unreasonable determination of the facts in the light of the record before it. Specifically, Katzenbach argues that an investigator's report supports his contention that he made Abel aware of his conflict with Judge Mejia and that Abel informed him he would have the judge removed. The investigation report dated November 17, 2004 states in pertinent part:

> At this point Attorney Abel told Mr. Katzenbach that one of the decisions to be made before heading to trial would be whether or not to have a judge or jury trial. Mr. Katzenbach informed Attorney Abel that he wanted a jury trial, as the current Judge Mejia "screwed him" when with the Public Defender's office. Mr. Katzenbach believed that then-Attorney-Mejia misled him into pleading guilty to a felony, when he thought it was only a misdemeanor.
>
> Attorney Abel informed Mr. Katzenbach that this was a conflict, and that he would have Judge Mejia removed from this case.

Respondent's Exhibit 154, No. 31.

In addition, Katzenbach argues Dr. Sasser's October 27, 2004 psychological evaluation memorialized Katzenbach's complaints about being tried by his former attorney and put all parties on notice of his concern about Judge Mejia's impartiality. Dr. Sasser noted:

> Recently he was in court with Judge Mejia and made a derogatory statement to the judge because of his frustration that his trial had not yet occurred. He was given an additional charge of contempt of court. He

15 - FINDINGS AND RECOMMENDATION

stated Judge Mejia was the court-appointed attorney who
represented him for the driving offense and made a
comment it was approximately 15 years ago...

* * *

He described a conflict he had in the courtroom
approximately four weeks prior to today's interview in
which he became angry with the Judge that a speedy trial
had not occurred.  The difficulty was that he told the
judge that the judge was "not listening to a fucking
thing I said."  He complained the judge "used to be my
public defender -- now he's my judge."  Because of that
interaction he stated, he was given an additional charge
of contempt of court.

Petitioner's Exhibit 2, pp. 3 & 7.

While I agree that the investigator's report supports

Katzenbach's assertion that he told Abel that he had a conflict

with Judge Mejia regarding a plea agreement in the past and that

Abel stated he would have the judge removed, this report does not

necessarily contradict Abel's assertions set out in his affidavit

presented during the PCR proceedings, *i.e.*, that Katzenbach did not

want the judge removed; that Katzenbach never told counsel that he

physically threatened his then attorney or that he was involved in

a car chase altercation with him; that counsel saw no indication

the judge remembered his representation of Katzenbach; and that

based on counsel's past experience, he believed the judge would be

just and fair.  The fact that Abel represented in a meeting with

the investigator and Katzenbach that he would have the judge

removed in view of Katzenbach's disclosures, does not preclude the

possibility that Katzenbach determined at some point, as Abel

16 - FINDINGS AND RECOMMENDATION

averred, that he did not want Mejia removed and Abel acted in accordance with his wishes.

With regard to Dr. Sasser's evaluation, I note that Katzenbach references the fact that Judge Mejia once represented him in a criminal matter when he is telling the doctor about some difficulty he had with Judge Mejia a few weeks prior over the delay in getting his trial started.  However, he makes no mention of any conflict he and Mejia had during that earlier representation or that he told Abel about any conflict or concerns he had that the judge was biased against him and that he wanted Judge Mejia removed from his case.  Accordingly, Dr. Sasser's evaluation also does not contradict Abel's affidavit.

As indicated above, the PCR court's explicit findings that Abel's memories were more reliable than Katzenbach's and that Abel would have moved for Judge Mejia's recusal if Katzenbach had asked him to are presumed correct and Katzenbach bears the burden of rebutting their presumption of correctness by clear and convincing evidence.  Based on the above examination of the record, the Court concludes that Katzenbach has failed to meet this burden.

Accordingly, the Court should conclude that Katzenbach has failed to meet his heavy burden under AEDPA of demonstrating that the PCR court's conclusion that Katzenbach presented no evidence demonstrating that the trial court was (actually or presumptively) biased against him or its denial of this claim involved an

17 - FINDINGS AND RECOMMENDATION

unreasonable determination of the facts or was contrary to or involved an unreasonable application of *Strickland v. Washington*.

2. <u>Katzenbach was denied his right to effective assistance of counsel when counsel stated within earshot of the prosecutor that the prosecutor had failed to elicit crucial testimony about the victim's rape, prompting the prosecutor to recall witnesses and introduce the missing evidence (Ground One, Subclaim D)</u>

According to Katzenbach, while talking to his mother, Ruth Katzenbach, during a break, Abel alerted the prosecutor to the fact that the prosecutor had failed to elicit testimony from Sally Bozarth, the woman whose home the victim Shannon Katzenbach (hereinafter "Shannon") had been taken to after she fled from Katzenbach and had been picked up on the road, and Angelica Smith, Shannon's sister, that Shannon had disclosed to them that she had been raped. Thereafter, the prosecutor recalled both of these witnesses and questioned them about the rape. Katzenbach contends the fact that the prosecutor took immediate steps to recall these witnesses after Abel made these comments despite the prosecutor having advised the court that he had no further questions for them, coupled with the statement of his mother wherein she asserts that the prosecutor overheard counsel on the break[5], establishes that

---

[5]   In her November 8, 2006 letter to the Oregon State Bar, Ruth Katzenbach complained:

> On the next break Mr. Ab[el] and I are standing outside the courtroom again and the DA [is] standing very close with his group of people and Mr. Ab[el] says the DA did not prove rape in the case with the last witness, I said yes I had noticed that the DA didn't even mention rape.

the prosecutor did overhear counsel's comments and that such comments prompted the prosecutor to recall Bozarth and Smith to question them about the sexual assault.    Moreover, Katzenbach maintains that this error on counsel's part was a material one because without his comments the prosecutor would not have recalled these witnesses to ask about the rape and the jury would have only known that Shannon reported many details about the incident to these witnesses, including details of the physical assault, but made no mention of rape.    This absence of a prior consistent statement regarding the rape by the victim would have cast doubt on this aspect of her testimony.

In response, respondent argues the PCR court's denial of relief on this claim resolves the factual dispute as to whether Katzenbach established that his counsel had revealed a client secret to the prosecutor.    Response [29], p. 19 (citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1983); *Columbe v. Connecticut*, 367 U.S. 568, 603-04 (1961)).

---

I turn to look and the DA is looking straight at us and has heard what we were discussing and when we went back into the court the first thing the DA does is "recall" the witness and ask about the rape.    Mr. Ab[el] was prompting the DA on how to do his job and I felt from that time on Wade did not get the representation from Mr. Ab[el] that he deserved.    This was a training session with Mr. Ab[el] training the DA.

Respondent's Exhibit 145.

Moreover, respondent argues that even assuming Katzenbach's mother's account is correct and the prosecutor was prompted to recall Bozarth and Smith to question them about the sexual assault when he overheard Abel's comments, Katzenbach cannot show prejudice because: (1) Smith could not remember if the victim mentioned the rape so her testimony did not add anything to support the sexual assault charges; and (2) Bozarth's testimony on recall that the victim had told her that she had been raped was a "small" addition to an otherwise overwhelming case against Katzenbach. Specifically, with regard to the rape, respondent argues DNA evidence confirmed there had been intercourse and other physical evidence at the scene was consistent with Shannon's account of the rape. Moreover, given the evidence of physical assault, including Bozarth's pre-recall testimony that the victim had told her she had been beaten as well as other testimony that the back of the victim's head was "caked with blood," a jury was unlikely to credit Katzenbach's bizarre story that the victim had consented to sex with him after such a beating and with duct tape covering her mouth.[6]

---

[6] At trial, Katzenbach testified about the duct tape as follows:

> I finished taking off my clothes, we made love. I better back up just a second. We were -- we were talking just before we were making love, and I -- I guess I was playing with her. And -- and she -- she started talking and everything, and I had a really hard time focusing on anything. Okay. Vision, understanding, or I -- I really don't know what I was -- I knew what I was doing at the

Katzenbach maintains the credibility of Shannon's testimony regarding the rape was a central issue in the case and that Bozarth's testimony was the "only testimony that could lend some credibility to Shannon Katzenbach's testimony regarding the alleged rape at a point close in time to the central events." Reply [31], p. 7. As such, he insists the PCR court's conclusion that he suffered no prejudice based on counsel's error is not entitled to deference.

The Court agrees that credibility was a key question bearing on the sexual assault charges at trial and that it is an important consideration here in examining the question of prejudice based on Bozarth's recall testimony. Katzenbach and Shannon gave vastly different accounts of the circumstances surrounding their DNA-confirmed intercourse. Respondent's arguments are well taken on this issue and I agree that even without Bozarth's testimony that Shannon had told her she had been raped, Katzenbach's version of events asserting that the victim consented to sex with him even

---

time. I knew that -- that nothing was wrong that I could see.

And she -- she just kept talking and confusing me, and confusing me. And I, it was like I couldn't process the information quick enough. And so I said, "Would you mind if I put some duct tape on your mouth?" She said, "Fine." So I walked to the truck, got a little piece of duct tape about that big, and just put it over her mouth. I didn't squish it on her or anything. I just put it there. I said, "Is that fine?" she says, "Yes." We made love.

Respondent's Exhibit 104, pp. 304-05.

after he had injured her badly enough that the back of her head was caked in blood and with her mouth duct taped, strikes the Court as wholly unbelievable.  Accordingly, the Court concludes that even without Bozarth's testimony a jury would have credited the victim's version of events explaining their intercourse, which as noted above was consistent with physical evidence at the scene, over Katzenbach's incredible one.  Katzenbach has not shown that there is a reasonable probability that but for counsel alerting the prosecutor to omissions in questioning Bozarth and Smith about the sexual assault the result of his proceeding would have been different.

Based on the foregoing, the Court should conclude that Katzenbach has failed to meet his heavy burden under AEDPA of demonstrating that the PCR court's denial of this claim involved an unreasonable determination of the facts or was contrary to or involved an unreasonable application of *Strickland v. Washington*.

3. **Katzenbach was denied his right to effective assistance of counsel when counsel failed to investigate potential witnesses and failed to call witnesses whose testimony would have cast doubt on the victim's testimony (Ground One, Subclaim C)**

According to Katzenbach, due to Abel's inadequate investigation, he failed to call helpful witnesses to testify on Katzenbach's behalf, including Tessica Rutledge and John Breen. Katzenbach asserts Rutledge would have testified: (1) that Shannon told her before the incident that she was plotting against

Katzenbach so he would not gain full custody of their son; and (2) that she knew Shannon had engaged in similar behavior before.  With regard to Breen, Katzenbach asserts counsel failed to interview him despite his request that the defense team do so.[7]  Katzenbach maintains Breen would have testified that he witnessed an argument between Katzenbach and Shannon two months before the incident over custody of their son that grew into a physical assault by Shannon on Katzenbach.  Katzenbach further indicates that Breen would have testified that Shannon falsely blamed Katzenbach for the assault and falsely claimed to be injured.

Katzenbach further contends that even though his counsel was aware of this potential testimony before trial, he mistakenly believed it was inadmissible character evidence.  Moreover, Katzenbach argues this Court should not defer to the PCR court's denial of this claim because that court also failed to recognize that the evidence in question was not character evidence, but rather was admissible impeachment evidence tending to contradict Shannon and reveal her bias against Katzenbach.

In response, respondent maintains that Katzenbach introduced affidavits from Rutledge and Breen during his PCR proceedings. Respondent asserts that in her affidavit Rutledge averred that she believed Shannon is an untruthful person and that she started the

---

[7]     This representation notwithstanding, Katzenbach also asserts "[c]ounsel was aware of Mr. Breen's potential testimony." Brief in Support [25], p. 39 (citing Abel's file).

conflict on the day in question. She further averred that she believed Shannon set Katzenbach up because she was afraid of losing custody of her son. In addition, Rutledge averred that Shannon had called her prior to their meeting to say they were meeting at their special spot to discuss Benny.[8] Respondent maintains that without any explanation as to their foundation, Rutledge's *beliefs* about Shannon would have been inadmissible.

With regard to Breen, respondent argues that he averred in his affidavit that he considered Shannon to be an untrustworthy person, a drug addict and abusive to most people. He also opined that he thought Katzenbach's punishment was not a proportional sentence. Respondent states that Breen did not discuss the prior domestic dispute in his affidavit and that there was no evidence before the PCR court that he was prepared to testify about it under oath. Moreover, even though the police report pertaining to the prior domestic dispute indicates Breen sided with Katzenbach, respondent argues counsel exercised reasonable professional judgment in not introducing evidence of another prior instance where Katzenbach

---

[8] Regarding this witness's belief that Shannon set Katzenbach up because she was afraid of losing custody of her son, the Court notes that Katzenbach actually admitted at trial that on the day in question he convinced Shannon to meet him by telling her that he wanted to talk about custody of their son and the possibility of him relinquishing custody, but that in fact his plan was to meet her to talk about their relationship because he still loved her and wanted to be with her. Respondent's Exhibit 104, pp. 315-16. Accordingly, it was Katzenbach who in essence admitted under oath at trial that he lied to get Shannon to meet him, *i.e.*, that he set her up.

engaged in physical altercation with Shannon.  Finally, respondent argues that even if Abel should have introduced Rutledge and Breen's testimony, Katzenbach cannot demonstrate that he was prejudiced by its omission because the evidence of his guilt, including physical evidence, was overwhelming and their testimony would have done nothing to bolster his unbelievable testimony.

The PCR court made the following relevant findings and conclusions relevant to this claim:

> Significant physical evidence and testimony by independent wits.  Even if att. called proposed wits, much of testimony not admissible.
>
> * * *
>
> Court finds attorne[y]'s memories more reliable than pet's.
>
> * * *
>
> Insufficient proof of any inadequacy w/ any of attorne[y]s.  No prejudice.

Respondent's Exhibit 175.

In addition, the PCR court had before it the affidavit of Abel wherein he averred:

> 7.    I performed a reasonable investigation under the circumstances while I represented Mr. Katzenbach. The defense interviewed all witnesses that Mr. Katzenbach suggested.  Beyond Mr. Katzenbach, the victim and the victim's sister though, there were no other eyewitnesses.  At best, the witnesses Mr. Katzenbach mentioned could potentially offer testimony about the character of the victim. However, testimony about the victim's character likely would have been either inadmissible and/or unpersuasive in light of the trial testimony.
>
> * * *

25 - FINDINGS AND RECOMMENDATION

> 13.  I presented all witnesses and evidence at trial
>      that Mr. Katzenbach wanted at the time.  There were
>      no witnesses available at the time of trial that
>      Mr. Katzenbach wanted presented that did not
>      testify at trial.  Mr. Katzenbach actually
>      testified at trial against my advice, and basically
>      admitted to the crimes.  Mr. Katzenbach's mother
>      and I met together with Mr. Katzenbach in jail,
>      asking him not to testify.  Yet, Mr. Katzenbach
>      still testified at trial against the advice from
>      both of us.

Respondent's Exhibit 169, pp. 3-4.

Given the physical evidence which corroborated Shannon's account of events and in consideration of Katzenbach's unbelievable version of events, I agree with Abel's assertion above that the testimony of the Rutledge and Breen would likely have been unpersuasive in light of the other trial testimony. Accordingly, on this record, even assuming counsel's failure to call the aforementioned witnesses at trial constituted ineffective assistance of counsel, Katzenbach cannot demonstrate that the PCR court's conclusion that he suffered no prejudice as a result is contrary or an unreasonable application of *Strickland*.

Therefore, the Court should conclude that Katzenbach has failed to meet his heavy burden under AEDPA of demonstrating that the PCR court's denial of this claim involved an unreasonable determination of the facts or was contrary to or involved an unreasonable application of *Strickland v. Washington*.

<u>**RECOMMENDATION**</u>

Based on the foregoing, the Petition for Writ of Habeas Corpus [2] should be DENIED, and judgment should enter DISMISSING this case with prejudice.

In addition, the district judge should certify that Katzenbach has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2). This case is not appropriate for appellate review.

### SCHEDULING ORDER

The Findings and Recommendations will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

### NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of

27 - FINDINGS AND RECOMMENDATION

appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

DATED this 25th day of April, 2016.

Paul Papak
United States Magistrate Judge

28 - FINDINGS AND RECOMMENDATION